UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CONTINENTAL DATALABEL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 5980 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| AVERY DENNISON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>**

Plaintiff Continental Datalabel, Inc., and Defendant Avery Dennison Corporation are

manufacturers of self-adhesive address labels.  Continental alleges in suit that Avery had

infringed Continental's patents in violation of federal patent law, had engaged in unfair

competition through false or misleading advertising in violation of the Lanham Act, and had

violated Illinois common law by tortiously interfering with Continental's efforts to sell its labels

to office supply retailers Staples and Office Depot.   The court stayed the patent claims pending a

reexamination of Continental's patents by the U.S. Patent and Trademark Office ("USPTO").

Doc. 43 (Shadur, J.).

Before the court is Avery's motion for summary judgment on the Lanham Act and

tortious interference claims, Doc. 132, and Continental's motion for summary judgment as to

liability on the Lanham Act claim, Doc. 118.  The case was reassigned from Judge Shadur's

calendar to the undersigned judge's calendar after the motions were filed.  Doc. 232.  Avery's

motion is granted and Continental's motion is denied.  As to the Lanham Act claim, Continental

has not adduced evidence from which a reasonable jury could conclude that Avery's advertising

statements were literally false or caused actual consumer confusion. As to the tortious interference claim, Continental has not adduced evidence from which a reasonable jury could conclude that Avery in fact made the tortious statements it is alleged to have made to Staples and Office Depot, and the statements that Avery did make were not tortious as a matter of law.

### Background

Avery's motion will be considered first and, because the motion will be granted, last. The following sets forth the material facts and inferences from those facts as favorably to Continental as the record and Local Rule 56.1 permit. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). The same holds for the additional facts referenced in the Discussion section below.

Continental and Avery are competing manufacturers of self-adhesive address labels. Doc. 203-2 at ¶¶ 1, 44. In 2006, both companies began to market labels designed to be easier to peel from their backing sheets: Avery's "Easy Peel" labels and Continental's "FastPly" labels. *Id*. at ¶¶ 7, 23-24; Doc. 237 at ¶ 1. Both companies' backing sheets were perforated in a manner allowing them to be torn into strips, with each strip holding a single column of labels; because the perforations were situated beneath the columns of labels, near the edge of the labels in each column, rather than between the columns, tearing the sheet into strips exposed the edges of the labels on each strip, which enabled them to be grasped and peeled off more easily than labels on "traditional" backing sheets, which have to be pulled off one-by-one. Doc. 203-2 at ¶¶ 8-9, 28.

In 2008, Avery introduced its "next-generation" Easy Peel labels, which were designed to enable the sheets to be folded to expose the labels' edges. *Id*. at ¶¶ 13-14; Doc. 237 at ¶ 9. The

advantage of these newer backing sheets was that, unlike sheets that had been torn, the folded

sheets could be un-folded (that is, re-flattened) after a few labels had been removed, so that the

remaining labels would be on an intact sheet without their adhesive edges exposed, allowing the

user to re-run the sheet through a printer.  Doc. 203-2 at ¶¶ 16-17.  Although Avery's

instructions advised the user not to put a sheet through a printer more than once, many

consumers did so and Staples saw this capability as an advantage of the next-generation labels.

Doc. 203-2 at ¶¶ 18, 128; Doc. 237 at ¶¶ 11-12, 22-23.

Continental continued to market its original FastPly labels rather than releasing a next-

generation version.  Doc. 203-2 at ¶ 24.  Continental's instructions explicitly advised the user to

tear the sheets along the perforations; they did not instruct the user to fold the sheets, as Avery's

instructions for its next-generation Easy Peel labels did.  *Id*. at ¶¶ 28-29.  However, a Continental

expert tested the FastPly labels, Avery's next-generation Easy Peel labels, and other labels to

determine which labels could in fact be folded.  *Id*. at ¶¶ 193-94, 198.  The expert concluded that

Continental's FastPly labels, like Avery's next-generation Easy Peel labels and unlike any other

labels he tested, did possess the "pop-up feature," meaning that they could be folded to make the

labels' edges "pop up" and become exposed without having to be torn.  *Id*. at ¶¶ 195-96, 198-

200; Doc. 237 at ¶ 82.  For purposes of resolving Avery's summary judgment motion, the court

will credit the expert's conclusion and assume that Continental's labels, like Avery's, possessed

the pop-up feature.

When Avery introduced its next-generation Easy Peel labels in 2008, the packaging and

other promotional materials included the following two statements: "Only Avery label sheets

bend to expose the Pop-up Edge™" and "Only Avery offers the Pop-up Edge™ for fast

peeling—just bend the sheet to expose the label edge."  Doc. 203-2 at ¶ 178.  By including the

trademark symbol ("™"), the "Only Avery" statements indicated that Avery asserted ownership of the trademark "Pop-up Edge." *Id*. at ¶ 184. Avery applied to register the trademark with the USPTO, which granted the registration in 2010. *Id*. at ¶ 185. Continental does not challenge the validity of Avery's "Pop-up Edge" trademark. *Id*. at ¶ 188.

Continental had interactions with Staples in 2006-2007 and 2009 and with Office Depot in 2008 that Continental hoped would result in their deciding to carry Continental's FastPly labels; ultimately, neither Staples nor Office Depot did so. *Id*. at ¶¶ 45-46, 73, 134, 147, 159, 166; Doc. 237 at ¶¶ 28, 30, 34. Continental alleges that the retailers' decisions not to carry the FastPly labels were caused by Avery's threats to sue Staples and Office Depot for infringement of patents it ostensibly had on technology that Continental ostensibly had incorporated into its FastPly products. Doc. 203-2 at ¶¶ 45-46, 91, 171; Doc. 237 at ¶ 49. In fact, Avery did not possess patents on the relevant technology at the time of Continental's discussions with Staples and Office Depot; though it had filed patent applications in 2004 and 2009, a patent was not granted until 2010, after the alleged tortious statements had been made. Doc. 237 at ¶¶ 49-50; U.S. Patent No. 7,709,071 ("Label Sheet Design for Easy Removal of Labels").

No Continental representative actually heard any Avery representative make the alleged tortious statements to Staples or Office Depot. Doc. 203-2 at ¶¶ 87-88, 138, 168. But two Continental officers, Tim Flynn and Neal Hermanson, were told by Staples and Office Depot representatives that those retailers were reticent about carrying Continental's FastPly labels because they feared a patent suit from Avery. Doc. 237 at ¶¶ 52-62. Flynn also learned that other retailers feared a patent suit from Avery if they bought FastPly labels. *Id*. at ¶¶ 63-64.

In 2009, an Avery representative sent an email to a Staples representative that, referring to Avery's pending patent applications, stated: "Once the patents are granted Avery will

aggressively defend its IP [intellectual property]."  Doc. 203-2 at ¶ 116; Doc. 237 at ¶ 49.  An

internal Avery document from mid-2008 referred to the Easy Peel labels as a "Patented Avery

Exclusive" well before Avery had actually been granted a patent on the relevant invention.  Doc.

237 at ¶ 50; Doc. 213 at 11.

## Discussion

### I.      Lanham Act Claim

Continental alleges that (1) the "Only Avery" statements assert that only Avery's labels

could be folded to expose the labels' edges without having to be torn, (2) Continental's FastPly

labels also possessed this feature, and (3) the "Only Avery" statements were therefore false or

misleading in violation of the Lanham Act.  The pertinent provision of the Lanham Act, 15

U.S.C. § 1051 *et seq*., provides:

> (a) Civil action
>
>     (1)  Any person who, on or in connection with any goods or services
> …, uses in commerce any word, term, name, symbol, or device …, or any
> … false or misleading description of fact, or false or misleading
> representation of fact, which—
>
>           \*    \*    \*
>
>     (B) in commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of his or her or
> another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any such person who believes that he or
> she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "The purpose of the false-advertising provisions of the Lanham Act is

to protect sellers from having their customers lured away from them by deceptive ads."

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir.

2009).  A plaintiff making such a claim must establish the following elements:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to [the] defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999). Because Continental cannot establish the first element, Avery is entitled to summary judgment on the claim.

For purposes of the first element, the Seventh Circuit draws a distinction between (1) statements that are literally false and (2) statements that are literally true or ambiguous but are misleading: "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hot Wax*, 191 F.3d at 820. The distinction is legally significant: "When the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so. In contrast, when the statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion." *Ibid.*; *see also B. Sanfield, Inc.*, 168 F.3d at 971-72; *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13-15 (7th Cir. 1992).

Thus, the initial question that must be resolved in considering the first element of Continental's Lanham Act claim is whether the "Only Avery" statements are "literally false as a factual matter." *Hot Wax*, 191 F.3d at 820. "A 'literal' falsehood is bald-faced, egregious,

undeniable, over the top. … The proper domain of 'literal falsity' as a doctrine that dispenses with proof that anyone was misled or likely to be misled is the patently false statement that means what it says to any linguistically competent person." *Schering-Plough Healthcare Prods.*, 586 F.3d at 513. As noted above, the two accused "Only Avery" statements read as follows: "Only Avery label sheets bend to expose the Pop-up Edge™" and "Only Avery offers the Pop-up Edge™ for fast peeling—just bend the sheet to expose the label edge." Doc. 203-2 at ¶ 178.

It is plain that both statements assert that only Avery's next generation Easy Peel labels—and not the labels offered by any Avery competitor—possess something that the statements call "the Pop-up Edge™." Continental contends that the statements claim exclusivity over the generic feature of a label's being able to be bent or folded so that its edges pop up, enabling them to be grasped and peeled easily. The court accepts for purposes of summary judgment that Continental's FastPly labels also possessed this feature, *id.* at ¶ 196, which means that if Continental is correct about the meaning of the "Only Avery" statements, those statements likely would be literally false. Avery responds that "Pop-up Edge" is an Avery trademark that was accompanied by the trademark symbol in the accused statements. From this premise, Avery contends that the statements assert not that Avery's labels alone offer the generic pop-up function described by the phrase, but merely that Avery's labels alone offer the particular version of that function that carries the "Pop-up Edge" name. If Avery is correct, then the "Only Avery" statements are true, because the trademark laws would prevent Avery's competitors from using the same phrase to describe their own labels.

Avery has the better of the argument, so much so that no reasonable jury could find otherwise. Avery draws a fruitful analogy to the McDonald's Quarter Pounder hamburger. "Quarter Pounder" is a registered trademark of McDonald's. *Id.* at ¶ 189. Like "Pop-up Edge,"

"Quarter Pounder" is a descriptive phrase; it refers to the weight of the patty in that type of McDonald's hamburger. Competing fast food chains may and undoubtedly do sell hamburgers with quarter-pound patties. Accordingly, while a McDonald's advertisement claiming that "only McDonald's serves hamburgers with quarter-pound patties" would be literally false, a advertisement claiming that "the Quarter Pounder® hamburger is available only at McDonald's" would not be false. The second advertisement refers to the particular quarter-pound hamburger offered by McDonald's, which alone holds the Quarter Pounder trademark; the first advertisement refers to a generic attribute of hamburgers offered by many other chains. If consumers understood the second advertisement to convey the same meaning as the first, then perhaps the second advertisement would be misleading and thus violate the Lanham Act. But the second statement cannot possibly be deemed "literally false" under the Lanham Act.

The same holds true of the "Only Avery" statements. The statement "Only Avery label sheets bend to expose the Pop-up Edge™" is not equivalent to the statement "Only Avery label sheets can be bent so that the labels' edges pop up and become exposed." While the second statement is literally false (or so the court assumes on summary judgment), the first is true or, at worst, ambiguous because it refers not to the generic attribute of edges that become exposed when the sheet is folded, but to the particular version of that attribute offered by Avery under the "Pop-up Edge" trademark. Nor would the first statement be literally false even if Continental's FastPly sheets were physically identical to Avery's next-generation Easy Peel sheets, for even then Continental could not describe its FastPly sheets with the trademarked phrase "Pop-up Edge™," which the trademark laws allow Avery alone to use. Accordingly, while the "Only Avery" statements may be ambiguous, they do not meet the standard for literal falsity: they are not "bald-faced, egregious, undeniable, [or] over the top," and nor would they convey a clearly

false meaning "to any linguistically competent person." *Schering-Plough Healthcare Prods.*, 586 F.3d at 513. No reasonable jury could find otherwise.

The only closely analogous decision found by the parties or the court is in accord. In *LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481 (D. Minn. 1996), one retailer of eyeglasses, Vision World, alleged that a competitor, LensCrafters, had violated the Lanham Act by claiming to be the "exclusive" seller of "Featherwate" lenses. *Id.* at 1498-99. "Featherwate" was a LensCrafters trademark and, like "Pop-up Edge" and "Quarter Pounder," also a descriptive term. Vision World claimed that LensCrafters, by advertising itself as the exclusive distributor of Featherwate lenses, was making the literally false statement that only LensCrafters offered lenses of a particular light-weight construction; in fact, the Featherwate lenses were merely polycarbonate lenses, which were available under other names from other retailers. *Ibid*. The court held that "no reasonable Juror could conclude that the challenged advertising is literally false, because the [Featherwate] products specifically referenced in the advertising are trademarked and, therefore, are not available from any other outlet than" LensCrafters. *Id.* at 1499.

District court decisions are not precedential, but well-reasoned district court opinions may be persuasive. *See Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005). The court finds *LensCrafters* to be well-reasoned and persuasive. Continental does not disagree with *LensCrafters*, but seeks to distinguish it on the ground that "Featherwate" was "not sufficiently descriptive to convey the false message that [LensCrafters] was the only supplier of polycarbonate … lenses." Doc. 203 at 72. The distinction is unpersuasive; "Featherwate" is as descriptive of light-weight lenses as "Pop-Up Edge" is of self-adhesive label edges that pop up.

If the accused statement in *LensCrafters* was not literally false, and indeed it was not, then neither were the "Only Avery" statements here. At worst, the statements were ambiguous.

Although the "Only Avery" statements are not literally false, Continental can satisfy the first element of its Lanham Act claim if it can show that the statements are "misleading in context, as demonstrated by actual consumer confusion." *B. Sanfield, Inc.*, 168 F.3d at 972; *see also BASF Corp.*, 41 F.3d at 1089; *Hot Wax, Inc.*, 191 F.3d at 820; *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 950 (N.D. Ill. 2009). Continental hired an expert witness named Brent Stahl to design and execute a consumer survey to determine whether consumers were misled by the "Only Avery" statements. Stahl's conclusions are the only evidence Continental offers on "actual consumer confusion" to support its view that consumers confronted with the "Only Avery" statements would understand them in context to assert exclusivity over the generic attribute of labels whose edges become exposed when the sheet is folded, as opposed to exclusivity over a trademarked product possessing that generic attribute.

Stahl's report explains that his "main objective was to determine what portion of a relevant population would be led, by the key words 'Only' and/or 'unique' in the ['Only Avery'] statements, to believe that the referenced label product feature, namely the Pop-up Edge™, is available from only one label company, namely the Avery Dennison Corporation." Doc. 217 at 4. Stahl presented test subjects, drawn from the population of likely users of self-adhesive labels, either with one of the accused "Only Avery" statements or with a control statement that tracked the "Only Avery" statements but dropped the terms "only" and "unique": "Avery label sheets bend to expose the Pop-up Edge™" and "Avery Easy Peel labels have the Pop-up Edge™ for fast and easy peeling." *Id*. at 7. Stahl then presented the subjects with a questionnaire that asked:

> What does this sentence communicate or say regarding how many label companies offer this feature?  (Read each possible answer and then choose one)
>
> ___   No label company offers this feature
> ___   Just one label company offers this feature
> ___   Two label companies offer this feature
> ___   Three or more label companies offer this feature
> ___   This sentence does not say how many label companies offer this feature

*Ibid*.  Stahl compared the percentage of the "Only Avery" group that chose the second answer—"Just one label company offers this feature"—to the percentage of the control statement group choosing that answer.  *Ibid*.  Stahl found that 82.1% or 82.5% of the "Only Avery" group selected that answer (depending on which of the two "Only Avery" statements the respondent was shown), while 34.4% and 36.7% of the control group did so.  *Id*. at 10.

Stahl's findings reveal only that the proportion of consumers who interpret statements using the words "only" and "unique" to convey exclusivity is much larger than the proportion of consumers who interpret statements that lack those terms to convey the same meaning.  Given the commonly understood definitions of the words "only" and "unique" in the English language, this is an unremarkable finding.  Continental characterizes Stahl's findings in this way: "The Stahl survey demonstrates that substantial segments of the respondent populations were misled by the improper 'Only Avery' phrase in the first advertisement, and the improper 'Only Avery' and 'unique' phrases in the second advertisement, into believing that just one label company offers the Pop-up Edge™."  Doc. 237 at ¶ 84.  Setting aside the argumentative words "misled" and "improper," this accurately characterizes Stahl's findings.  Those findings do not help Continental because the pertinent question here is not how consumers interpret the words "only" and "unique"—there is no dispute about what those words mean—but how they interpret the key

term "Pop-up Edge™." Stahl's survey cannot answer that question because the "Only Avery" statements and the control statements both contained that term, and because the questionnaire did not ask the respondents how they interpreted that term.

It follows that Stahl's study, the only evidence Continental puts forward on this issue, does not speak to whether the "Only Avery" statements are misleading in context, as shown by actual consumer confusion. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011) (affirming the grant of judgment as a matter of law to a Lanham Act defendant where the survey conducted by the plaintiff's expert did not bear on "the actual allegations in the case"). Because the "Only Avery" statements are not literally false, and because Continental has produced no evidence that the statements caused actual consumer confusion, Continental cannot satisfy the first element of its Lanham Act claim. Avery accordingly is entitled to summary judgment on that claim. *See First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 805-06 (7th Cir. 2001). This disposition makes it unnecessary to address the other grounds advanced by Avery for summary judgment on the claim.

## II. Tortious Interference Claim

Continental also alleges that Avery tortiously interfered with its business expectations with Staples and Office Depot. The parties agree that Illinois law controls, and so that is the law the court will apply. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998). Illinois law requires a tortious interference plaintiff to establish these elements: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296,

1299 (Ill. 1996); *see also Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007); *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Continental's claim fails because it has not adduced admissible evidence from which a reasonable jury could find the third element.

Continental asserts that Avery representatives falsely told Staples and Office Depot either or both of these things between 2006 and 2009: (1) that Avery held a patent that Continental's FastPly labels infringed, when in fact Avery had only a pending patent application at the time; and (2) that FastPly infringed Avery's pending patent application and that Avery would sue for violation of that patent application, when in fact a patent applicant cannot sue for infringement of its application. Doc. 203 at 35-36; *see Abbey v. Mercedes Benz of N. Am., Inc.*, 138 F. App'x 304, 307 (Fed. Cir. 2005) ("A patent application cannot be infringed."). Either statement, if made, would have been false and unjustified, and could therefore ground a tortious interference claim. *See Foboha GmbH v. Gram Tech., Inc.*, 2008 WL 4619795, at *1-2 (N.D. Ill. Oct. 15, 2008). The question is whether Continental has adduced admissible evidence from which a reasonable jury could find that Avery actually made either of those statements.

Continental's evidence consists primarily of the deposition transcripts and affidavits of Continental executives Flynn and Hermanson. Continental does not suggest that Flynn or Hermanson actually heard Avery make the statements to Staples or Office Depot. Doc. 203-2 at ¶¶ 87-88, 138, 168. Rather, as to Staples, Continental maintains that Flynn and Hermanson *were told* by Staples representatives that Staples was unwilling to buy Continental's FastPly labels because Avery had threatened to sue Staples for patent infringement if it did. Doc. 237 at ¶¶ 52-62; Doc. 203 at 39-44, 47-48, 51-52. For example, Flynn avers as follows:

> On December 13, 2008 [he meant 2007], I attended a meeting with members of Staples, Inc.'s Brand Group and Staples' Retail Buyer …. I was accompanied by Neal Hermanson of Continental. During the meeting,

> we were told at least three times that Staples, Inc. would not purchase Fastply$^{TM}$ labels from Continental because Avery representatives told Staples, Inc. that Continental's Fastply$^{TM}$ labels could infringe Avery's pending patent application. The people who told us this included Steve Lubarsky, Ken Zins and David LeClair.

Doc. 210-1 at ¶ 10. Hermanson recalls the same meeting as follows:

> Referring to Paragraph 10 of The Flynn Declaration, I was present with Tim Flynn at the meeting with Staples, Inc. personnel. The meeting occurred on December 13, 2007 (not December 13, 2008). … At the meeting, Steve Lubarsky, Ken Zins and David LeClair indicated that Staples, Inc. would not purchase Continental's Fastply$^{TM}$ label assemblies because Staples, Inc. had been notified by Avery representatives that Avery had a pending patent application covering the technology, and Continental's Fastply$^{TM}$ label assemblies could infringe the patent application.

Doc. 205 at ¶¶ 10-11. Flynn also avers that "I was told on several other occasions that Staples, Inc. would not purchase Fastply$^{TM}$ label assemblies from Continental due to concerns regarding Avery's pending patent application." Doc. 210-1 at ¶ 11.

As to Office Depot, Flynn and Hermanson aver that Office Depot representatives told or suggested to them that Office Depot's beliefs about an Avery patent or patent application had influenced Office Depot's decision not to purchase Continental's Fastply labels; Flynn and Hermanson do not aver, however, that the Office Depot representatives claimed that Avery told them about the Avery patent or application. Flynn states that during a product presentation to Office Depot, when Continental's representatives stated that its Fastply labels competed with Avery's Easy Peel labels and that Continental had two relevant patents, "[t]he Office Depot representatives responded that they thought Avery had a patent on the technology." *Id*. at ¶ 16. Flynn "responded that Avery has a pending application, and Continental has two issued patents." *Ibid*. Ultimately, Office Depot rejected Continental and dealt with Avery, and Flynn "believe[s] the concerns expressed by Office Depot personnel over Avery's pending patent application were

-14-

a factor in that decision." *Id.* at ¶ 17. Regarding a later rejection by Office Depot, Flynn avers: "Again, it appeared to me that Avery's pending application was a factor in Office Depot's purchasing decisions." *Id.* at ¶ 18. Flynn does not explain the basis for this assumption. Hermanson's affidavit echoes Flynn's: he "recall[s] being told [at a meeting with Office Depot representatives] that Office Depot believes Avery has a patent that would cover Continental's Fastply™ label assemblies. One or more Office Depot representatives expressed that concern." Doc. 205 at ¶ 23. Regarding Office Depot's ultimate rejection of Continental, Hermanson avers: "I also believe the concerns expressed by Office Depot representatives over Avery's pending patent application were a factor in that decision." *Id.* at ¶ 24.

Flynn and Hermanson testified similarly at their depositions. Doc. 208 at 9 ("Everybody [at Office Depot] thought Avery had a patent on the product. It was amazing. … They have a fear of doing business with us because they say, number one, Avery has got a patent on the product. You explain to them they don't have a patent on the product. And you say, 'What are you afraid of? We have the patent.' They said, 'Avery will sue us.'"); Doc. 204-2 at 21 ("Staples was under the impression that Avery already had such a patent [on the Easy Peel technology]. And they were concerned that if they came out with this product [the Fastply labels], that they would be infringing on Avery's patent and be sued for patent infringement."); Doc. 207 at 5 (Hermanson agreeing with the assertion that Staples representatives "indicated that Staples, Inc. would not purchase Continental's Fastply label assemblies because Staples, Inc. had been notified by Avery representatives that Avery had a pending patent application covering the technology").

Flynn's and Hermanson's deposition testimony and declaration averments are hearsay, because the pair merely repeat the alleged out-of-court statements of declarants (the Staples and

Office Depot representatives) to prove the truth of the matter asserted in those statements: that Avery had in fact made patent-related threats to Staples and Office Depot. *See* Fed. R. Evid. 801(c). (Flynn and Hermanson do not actually say that the Office Depot representatives told them that Avery had made patent-related threats, but to simplify the discussion the court will assume that Office Depot stands in the same position as Staples in this respect.) Hearsay is inadmissible unless it falls within an exception to the hearsay rule, and no exception applies to Flynn's and Hermanson's testimony and averments. Continental argues that the evidence is not hearsay because it not offered for the truth of the matters asserted *by Avery* in saying, for example, that Continental's products infringed Avery's patent application. That argument misapprehends the problem with the evidence. The evidence is not relevant to, and is not being offered for the truth of, what Avery told the Staples and Office Depot representatives. Rather, the evidence is relevant to, and is being offered for the truth of, only the matters asserted *by the Staples and Office Depot representatives*—which is that Avery had told them that Avery had a patent when in fact it did not, and/or that Avery had suggested to them that Continental's products infringed Avery's patent application. If offered for that purpose, which is the only purpose that would allow Continental to establish the third element of its tortious interference claim, the evidence is hearsay. *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002) ("to the extent that Mr. Martin is repeating what his wife told him, that evidence is inadmissible hearsay"); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment.").

-16-

Continental alternatively contends that Flynn's and Hermanson's evidence falls within the hearsay exception established by Federal Rule of Evidence 803(3).  That rule provides that the hearsay bar does not apply to "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) …, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3); *see Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 569 (7th Cir. 2009).  Rule 803(3) allows Flynn and Hermanson to testify that the Staples and Office Depot representatives said that they were concerned about Avery's patent or patent application when deciding whether to purchase Continental's products, for that would merely describe the declarants' intent (to not buy Continental's products) and their motive (fear of litigation with Avery).  *See EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002) ("[T]he Chicago Hospitals argues that Borkowicz's statement that Levya told him that 'it looked like she was going to get fired' is inadmissible hearsay.  But the statement was not used for the truth of the matter asserted (*i.e.,* that it indeed did look like Levya would be fired), but to show Levya's state of mind at the time she returned to work."); *Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 980-81 (9th Cir. 2012).  But Rule 803(3), by the plain terms of its exclusion of "a statement of memory … to prove the fact remembered … unless it relates to the validity or terms of the declarant's will," does not allow Flynn and Hermanson to testify as to what the Staples and Office Depot representatives said was the *source* of their concern: Avery's alleged statements or threats to them about its patent or patent application.  That part of the declarants' out-of-court statements pertains to a fact ostensibly remembered by them—what Avery representatives had said to them—and thus is not saved from inadmissibility by Rule 803(3). Put another way, the evidence that Continental needs to show the third element of its tortious

-17-

interference claim consists of statements of the declarants' memories of what they were told by Avery representatives, which are being offered to prove that the remembered statements were indeed made. Rule 803(3) places such evidence outside that provision's exception to the ban on hearsay evidence. *See* Advisory Committee Note to Rule 803(3) (1972) ("The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind."); *United States v. Stallworth*, 656 F.3d 721, 727-28 (7th Cir. 2011) ("Stallworth contends that the state of mind at play here is Weathers's belief that Stallworth was investigating Vargas. Even if we were to credit Stallworth's explanation of the conversation, however, the main reason to present Weathers's statement of belief would be to prove that Stallworth was in fact investigating Vargas. This would then be a statement of belief used to prove the 'fact remembered or believed.' This logic thus leads to the conclusion that Weathers's statement does not fit within Rule 803(3)'s hearsay exception."); *Oberman v. Dun & Bradstreet, Inc.*, 507 F.2d 349, 352 (7th Cir. 1974) (holding that the state-of-mind exception does not apply where "the declaration was the result of the memory of past events, and the declaration therefore carried the inference that these events actually occurred").

Although it seeks damages only for the alleged interference with its prospects with Staples and Office Depot, Continental tries to buttress its claim with evidence that Avery engaged in a broad pattern of interference with Continental's prospects with other potential customers. Doc. 237 at ¶¶ 63-64; Doc. 203 at 48-51. Continental asserts that "Avery's pattern of spreading fear of a nonexistent patent extended beyond Staples and Office Depot." Doc. 237 at ¶ 63. In support, Continental cites Flynn's deposition testimony that "[w]hat happens every

time we approach the buyer [employed by office supply retailer OfficeMax], and I don't remember that particular buyer's name, it is always said by the buyer that Avery has got a patent on the product when they don't. And then you say, 'It is a patent pending.' And then they say, 'Oh.' And then the next thing that happens is, 'Well, we prefer not to do anything because Avery has got the patent pending.'" Doc. 208 at 6. Continental also asserts that "Lewis Scott of Simon Marketing was afraid of being sued by Avery even though Mr. Flynn told Mr. Scott that Avery did not have a patent." Doc. 237 at ¶ 64. In support, Continental cites Flynn's testimony that, when approached by Continental about potentially buying the Fastply labels, Scott responded "[w]ith fear" and "[h]e was afraid of being sued by Avery." Doc. 208 at 23.

Had Flynn testified that the Simon Marketing or OfficeMax representatives had told him that the source of their fear was patent-related statements by Avery, the evidence would be inadmissible hearsay for the reasons given above. But Flynn did not so testify; he testified only that the Simon Marketing and OfficeMax representatives thought that Avery had a patent and were afraid of being sued. This testimony provides no support, not even inadmissible hearsay support, for the proposition that Avery had in fact asserted that it had a patent or would sue on its patent application, because the Simon Marketing and OfficeMax representatives may have come to their beliefs by some route other than statements by Avery. At most, the testimony provides a basis for speculation that Avery may have made such statements. That is not enough, as "it is well-settled that conjecture alone cannot defeat a summary judgment motion." *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) (internal quotation marks omitted); *see also Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012) ("Mr. Hanners's assertion that he would not have been suspended for thirty days had he been an African American amounts to mere speculation, which this court consistently has held is insufficient to avoid summary judgment.").

Accordingly, to the extent that they are offered as evidence that Avery made tortious statements to Office Depot and Staples in the 2006-2009 time frame, Flynn's and Hermanson's deposition testimony and averments are inadmissible hearsay and speculation. If Avery made tortious statements to representatives of Staples and Office Depot (or any other firm), Continental should have had those representatives attest, either at deposition or in an affidavit, to having heard such statements. Continental did not do so.

Continental points to three other pieces of evidence to support the third element of its tortious interference claim, but they too are insufficient. The first is an internal marketing presentation delivered to Avery's sales force in mid-2008, marked "Highly Confidential," that referred to the Easy Peel labels as a "Patented Avery exclusive." Doc. 237 at ¶ 50; Doc. 213 at 2, 11. Avery was not granted a patent until 2010, so the quoted language was incorrect. But absent any evidence (other than speculation and inadmissible hearsay) that Avery actually made such an assertion to Staples or Office Depot—for instance, testimony from Staples or Office Depot representatives that they heard such assertions from Avery personnel, admissions by Avery personnel that they made them to Staples or Office Depot, or evidence indicating that the internal marketing presentation had been seen by Staples or Office Depot—this evidence is no more than the proverbial "scintilla" that is insufficient to prevent summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to forestall summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."); *Wainscott v. Henry*, 315 F.3d 844, 853 (7th Cir. 2003) (affirming summary judgment for the plaintiff on ground that the defendant's "argument essentially highlights one, inconsequential, marginally reliable piece of evidence while ignoring a substantial amount of credible and highly

relevant evidence"). No reasonable jury could infer from the mere fact that an internal Avery document referred to Easy Peel as "patented" that Avery had actually presented Easy Peel as patented to Staples and Office Depot and thereby misled those retailers and caused them to avoid dealing with Continental.

Second, pointing to evidence that Staples in 2006 and 2007 was looking into whether Avery held a patent that might cover Continental's FastPly product, Continental argues that "Staples' enduring 2006-2007 fear of a nonexistent Avery patent could have only originated from Avery." Doc. 203 at 46. The argument is without merit. Continental has adduced no evidence from which a reasonable jury could conclude that Staples's fear arose from Avery's telling Staples in 2006 or 2007 that Avery had a patent or that it would sue to enforce its patent application. That conclusion is entirely speculative, and speculation does not make a claim triable. *See Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 893 (7th Cir. 2010) ("Nor does anything we see in the record support Truhlar's assertions … that Smith acted in bad faith when he withdrew and later failed to reinstate the grievances. … Truhlar cited no such evidence but instead suggested that an improper motive is the only 'reasonable explanation' for Smith's conduct. Such unsupported speculation is insufficient to overcome a motion for summary judgment."); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment."); *Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) ("when the evidence provides for only speculation or guessing, summary judgment is appropriate"); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995) ("Hedberg's desired inference [from evidence that Knowling learned of Hedberg's illness around November 11], that Pund must have told Knowling of [the] illness before October 12, is not reasonable; it is unsupported

speculation.  Such speculation does not meet a party's burden of producing some defense to a summary judgment motion.").

Third, Continental points to the following email that Avery sent to Staples in 2009, before Avery was granted any relevant patents:

> Avery has made 2 rounds of patent applications for Easy Peel.  The first set of patent applications were filed several years ago and the additional patent applications were filed for the pop up edge which are even stronger than the first set of filings.  *Once the patents are granted* Avery will aggressively defend its IP.

Doc. 203-2 at ¶ 116 (emphasis added); Doc. 237 at ¶ 49.  Continental complains of the final sentence, which essentially says that Avery will sue anybody it views as an infringer once its patent is granted.  But there is nothing false about the statement, and Continental cites no authority to support the implausible proposition that a company's statement that it intends to enforce its patents against believed infringers could be "unjustified" for purposes of the third element of a tortious interference claim.

Indeed, any state law imposing liability for warning of potential patent litigation, without more, would be preempted by federal patent law, which "preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation."  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004); *see also Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37-38 (1913) ("Patents would be of little value if infringers of them could not be notified of the consequences of infringement ….  Such action, considered by itself, cannot be said to be illegal.").  The principle applies to a patent applicant's statement that it will enforce its patent once the patent is granted.  *See Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 680 (Fed. Cir. 1997) (affirming summary judgment for the defendant on a California unfair competition

-22-

claim where the defendant told a non-party that "[w]e believe that the product sold by [the plaintiff] falls within the scope of the pending application and that their sale of the [product] will infringe [the defendant's] patent when it issues," and noting that the plaintiff "points to no authority holding that it is unfair competition for a patent applicant to advise a prospective customer of the status of his pending patent application and of the applicant's belief that competing goods will infringe the patent if and when it issues"). There is an exception to this preemption principle: "State law claims … can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith.'" *Globetrotter Software*, 362 F.3d at 1374. There is no evidence, however, that Avery acted in bad faith when it warned Staples that it would enforce its patent when granted. Continental's argument that the federal patent privilege is an affirmative defense and that Avery has asserted the defense too late, Doc. 203 at 53-54, is baseless. Judge Shadur ruled in open court on March 2, 2011, that Avery would be permitted to make this argument and that it would not be treated as an affirmative defense. Doc. 245 at 9-11.

It is true that the precise wording of Avery's email—"Once the patents are granted"—suggests that it expected to receive a patent when in fact it could not have been certain that the USPTO would grant its applications. But, again, Continental has cited no authority for the proposition that a company's expression of confidence that a patent will be granted can be tortious. The case it does cite, *Foboha GmbH v. Gram Technology, Inc.*, *supra*, is not on point because it dealt with flatly false statements: the defendant first demanded that the plaintiff pay to use the defendant's "patented technology" when the defendant had not yet been granted a patent, and then, after the USPTO reexamined the defendant's patent and rejected claims 1 through 10, the defendant published a press release stating that "the [USPTO] has confirmed the patentability of the [patent's] 10 original claims." *Id*. at *1-2. Avery's email, by

contrast, was not false; in particular, it neither asserted that Avery already had a patent nor asserted that Avery would sue for violation of its patent application before an actual patent was granted.  If anything, the email acknowledged to Staples both that Avery did not yet have patents and that it could not sue on a patent application.  Avery sent the email in response to a question from a Staples employee asking whether Avery had any "opinion letters from outside counsel that clears its Easy Peel patents?"  Doc. 203-2 at ¶ 116.  A rule prohibiting a prospective patentee from telling interested firms what it intends to do with the patent if granted would make no sense.  *Cf. Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1050 (Ill. App. 2010) ("where a business entity provides accurate and proper reports to another entity in a reasonable business transaction, providing those reports should not constitute intentional interference").  The email was not tortious.

For these reasons, Continental cannot establish the third element of its tortious interference claim.  Avery accordingly is entitled to summary judgment on that claim.  *See Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 968 (7th Cir. 2011); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 433 (7th Cir. 2009).  This disposition makes it unnecessary to address the other grounds submitted by Avery for summary judgment on the claim.

### Conclusion

Summary judgment is granted to Avery on the Lanham Act and tortious interference claims.  It necessarily follows that Continental's cross-motion for summary judgment on liability for the Lanham Act claim is denied.

November 9, 2012

_____
United States District Judge